Copies to: Judge
AUSA – Special Proceedings
Dft.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 09-cr-64 |
| | ) | |
| | ) | **Oral Argument Requested** |
| · FRASER VERRUSIO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## FRASER VERRUSIO'S MOTION TO VACATE, SET ASIDE, AND CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255, OR IN THE ALTERNATIVE, PETITION FOR A WRIT OF ERROR *CORAM NOBIS*

Pursuant to 28 U.S.C. § 2255, Defendant Fraser Verrusio respectfully moves this Court to vacate his convictions because (i) the indictment violated his rights under the Grand Jury Clause of the Fifth Amendment, and (ii) he was denied his constitutional right to a fair trial. In the alternative, pursuant to 28 U.S.C. § 1651, Mr. Verrusio respectfully petitions the Court for a writ of error *coram nobis* on the same grounds.

### INTRODUCTION

The prosecutions of Mr. Verrusio, former public official with the House Transportation Committee, and former Governor of Virginia Robert McDonnell are alike and different in important ways. Both were accused of accepting items of value, both were accused of engaging in official action, as defined in 18 U.S.C. § 201(a)(3), and in both cases, the government lacked evidence that either one intended to use their position to influence the decision-making process. The similarities largely end there.

While Mr. McDonnell was lavished with expensive gifts and luxurious trips, Mr. Verrusio accepted a one-night trip to New York from lobbyists and their client. While Mr. McDonnell's influence in the Virginia government as sitting governor is obvious, Mr. Verrusio

was not alleged to have had any official or unofficial responsibilities relating to the drafting or passing of legislation. Mr. Verrusio's main job responsibility as a public official was to serve as a liaison between outside parties, like lobbyists, and the House Transportation Committee.

While Mr. McDonnell took many actions that were arguably favorable to his gift-giver, Mr. Verrusio was not alleged to have done much of anything. He "discussed" legislation with the lobbyists and their client, and he "suggested" to two veteran lobbyists that they organize a letter-writing campaign to advance their clients' legislative interests. There was no testimony at trial that Mr. Verrusio ever discussed the lobbyists' interests with anyone who worked in the House, and there was no testimony that he ever discussed the lobbyists' interests with anyone but his alleged co-conspirators.

While Mr. McDonnell has escaped the consequences of the government's overreach, Mr. Verrusio continues to suffer irreparable harm based on allegations and evidence of conduct that are not prohibited under 18 U.S.C. § 201(b). It would be a miscarriage of justice for Mr. Verrusio to not receive the vindication he deserves.

Mr. Verrusio's convictions should be vacated because at least two of his core constitutional rights as a criminal defendant have been violated. First, because the indictment lacks an allegation of official action, it fails to allege an element of the offense in violation of the Grand Jury Clause of the Fifth Amendment. Second, Mr. Verrusio was deprived of his right to a fair and impartial trial under the Fifth and Sixth Amendments, including his right to compulsory process. Given that Mr. Verrusio repeatedly argued during his trial that the government was relying on evidence to prove official action that was not covered by the statute, and that he has now been proven correct, his trial can hardly be viewed as having been fair or consistent with due process.

Mr. Verrusio was also prevented from calling his most important witness, Ms. Vivian Curry. The D.C. Circuit held that Mr. Verrusio failed to show that Curry's excluded testimony was material. While that decision was wrong at the time, it has been further undermined by *McDonnell*. The D.C. Circuit assessed materiality in the context of its now abrogated interpretation of official act. Under the proper reading of official act, the materiality of Curry's testimony only grows stronger because she was a close colleague of Mr. Verrusio who was expected to testify that the alleged co-conspirators never mentioned Mr. Verrusio to her—even though, as elicited by the government at trial, one co-conspirator was actively lobbying Curry on the same issues that Mr. Verrusio was purportedly being "helpful" on. For these reasons, Mr. Verrusio's convictions should be vacated under 28 U.S.C. § 2255.

In the alternative, Mr. Verrusio's petition for a writ of error *coram nobis* should be granted and his convictions vacated because he can show that (i) no more usual remedy exists; (ii) he has been diligent in challenging his convictions; (iii) he continues to suffer adverse consequences from his convictions; and (iv) the error resulting from the violation of his rights is of a fundamental nature.

Finally, given the Supreme Court's comment about needing to protect against overzealous prosecutions because it cannot be assumed that the government will always use its power "responsibly," *see McDonnell*, Slip Op., at 23, Mr. Verrusio believes it is appropriate for the Court to consider the government's conduct in prosecuting this case when assessing whether Mr. Verrusio's rights were violated and what the appropriate remedy should be for those violations. The manner in which the government prosecuted this case speaks for itself and further weighs in favor of a finding that vacating Mr. Verrusio's convictions is the only way to avoid a miscarriage of justice.

## BACKGROUND

### I.     INDICTMENT, TRIAL, AND APPEAL

On March 6, 2009, a three-count indictment was filed against Mr. Verrusio, and on June 14, 2010, a superseding indictment was filed. *See* Appx. 33–49.[1]

Count One alleged that Mr. Verrusio conspired to give and to receive illegal gratuities, in violation of 18 U.S.C. § 371.  Indictment ¶ 8–25; Appx. 36–43.  Mr. Verrusio allegedly conspired with Trevor Blackann, Todd Boulanger, James Hirni, and Todd Ehrlich to provide himself and Blackann with things of value for or because of official acts favorable to United Rentals, an equipment rental company that employed Boulanger and Hirni as lobbyists.  *Id.*

Count Two alleged that Mr. Verrusio accepted items of value for and because of an official act performed or to be performed, in violation of 18 U.S.C. § 201(c)(1)(B).  *Id.* ¶¶ 26–28; Appx. 44–45.  Mr. Verrusio allegedly accepted items of value "for and because of his official assistance provided and to be provided to [United Rentals'] efforts to secure favorable amendments to the Federal Highway Bill."  *Id.*

Count Three alleged that Mr. Verrusio knowingly made a false statement on Schedule VI of his 2003 financial disclosure form, in violation of 18 U.S.C. §§ 1001(a)(2) and (c)(1) and 2. *Id.* ¶¶ 29–34; Appx. 46–47.  Mr. Verrusio allegedly failed to disclose items of value received from United Rentals as "gifts" on Schedule VI.  *Id.*

Mr. Verrusio went to trial, which began on January 25, 2011.  On February 10, 2011, the jury convicted him of all three charges.  On August 5, 2011, the district court sentenced him to one day of incarceration, six months of home detention, fifty hours of community service, and two years' supervised release.  *See* Tr. (8/5/2011) at 54–55; Appx. 439–40.

---

[1] Citations to "Appx. __" refer to the record filed with the D.C. Circuit, *see* Case No. 11-3080. Citations to "Tr. __" refer to proceedings before the district court.

On August 15, 2011, Mr. Verrusio filed an appeal. The judgment of the D.C. Circuit affirming Mr. Verrusio's convictions was entered on August 12, 2014. After the D.C. Circuit denied rehearing en banc, Mr. Verrusio petitioned the U.S. Supreme Court for a writ of certiorari. That petition was denied on June 29, 2016.

Because Mr. Verrusio's motion pursuant to section 2255 is being filed within one-year of his conviction becoming final, his motion is timely. The doctrine of error *coram nobis* does not have a defined time period, but given the timelieness of Mr. Verrusio's section 2255 motion and the timing of *McDonnell*, Mr. Verrusio's petition should be considered timely.

## II.   STATEMENT OF THE FACTS

### A.   KEY PLAYERS

At the time of the alleged offenses, the below individuals held the following positions.

Mr. Verrusio was the policy director for the Committee on Transportation and Infrastructure for the U.S. House of Representatives ("Transportation Committee"). Tr. (1/27/2011, afternoon) at 75:10–25; Appx. 213. Mr. Verrusio acted as a liaison between lobbyists and the members of the Transportation Committee. Tr. (1/26/2011, morning) at 67:25–68:14; Appx. 190; *see also id.* at 79:20–80:3; Appx. 193.

Trevor Blackann was a legislative assistant to Senator Kit Bond. Tr. (1/27/2011, afternoon) at 69:6–8; Appx. 212. During his employment, Blackann accepted various items totaling thousands of dollars from lobbyists in exchange for his legislative assistance. *Id.* at 82:14–83:14; Appx. 215; *id.* at 92:4–93:13; Appx. 217–18. Blackann pleaded guilty to filing a false tax return for the year 2003. *Id.* at 82:6–7; Appx. 215.

Todd Boulanger, a former Senate staffer, was a lobbyist for Greenberg Traurig. Tr. (1/26/2011, morning), at 44:2–4; Appx. 184. Boulanger provided Blackann with expensive meals, drinks, and tickets to sporting events. *Id.* at 93:4–11; Appx. 197. Boulanger described

Blackann as a "champion." *Id.* at 93:15–94:16; Appx. 197.  A champion was someone who "did whatever [Boulanger] asked." *Id.*  Boulanger did not view Mr. Verrusio as a champion.  *Id.* Boulanger could not recall Mr. Verrusio ever asking him for anything.  Tr. (1/27/2011, morning) at 41:12–42:11; Appx. 206.  Boulanger pleaded guilty to conspiracy to commit honest services fraud.  Tr. (1/26/2011, morning) at 43:18–19; Appx. 184.

James Hirni, a former Senate staffer, was a lobbyist at Sonnenschein, Nath & Rosenthal. Tr. (1/31/2011, afternoon) at 34:3–13; Appx. 238.  Hirni pleaded guilty to conspiracy to commit honest services fraud.  Tr. (1/31/2011, afternoon) at 37:25–38:2; Appx. 241–42.

Todd Ehrlich worked in the corporate security department at United Rentals and also had a role in United Rentals' efforts to establish a lobbying practice in Washington, D.C. *See* Tr. (2/2/2011, morning) at 5:17–25; Appx. 292.

Vivian Curry was the legislative director for Congressman John Boozman, a member of the House Transportation Committee.  Appx. 132.

## B.   UNITED RENTALS

United Rentals' primary business is renting construction equipment to builders.  Tr. (1/26/2011, morning) at 50:16–51:6; Appx. 186.  It has branches throughout the country.  *Id.*

In 2003, United Rentals retained Boulanger and Hirni to act as its lobbyists with three goals in mind.  *Id.* at 51:12–52:13; Appx. 186.  First, it wanted to secure a spot on the General Services Administration schedule, so that it would be eligible to provide services to the government.  *Id.* at 51:21–52:9; Appx. 186.  Second, it wanted to pursue "competitive advantages" in the next legislative cycle.  *Id.*  And, third, it wanted to build up its brand among policy makers.  *Id.*

With regard to the second goal, United Rentals focused on the expected reauthorization of the Federal Highway Bill.  *Id.* at 53:1–21; Appx. 187.  The company and its lobbyists had

three legislative ideas. *Id.* at 54:2–55:7. The first was aimed at encouraging state Departments of Transportation to rent construction equipment instead of buying it. *Id.* The second goal was to encourage states to use United Rentals' intelligent transportation system. *Id.* And the third concerned workzone safety—United Rentals wanted Congress to increase the level of liability insurance that was required in its industry, which would give it a competitive advantage over certain competitors. *Id.*

### C.   NEW YORK TRIP

On October 17, 2003, Hirni invited Mr. Verrusio and Blackann to come to New York City the following day. Tr. (1/31/2011, afternoon) at 57:14–18; Appx. 250. Hirni informed Mr. Verrusio and Blackann that the trip would involve a business dinner with himself, Ehrlich, and several executives from United Rentals, and would also include tickets to Game 1 of the World Series. *Id.* at 55:24–58:11; Appx. 248–51. Before inviting them, Hirni sought and received approval for the trip, including the game, from the head of the lobbying group at Sonnenschein. Tr. (2/1/2011, morning) at 144:4–146:6; Appx. 279–81. Mr. Verrusio and Blackann accepted the invitation. Tr. (1/31/2011, afternoon) at 57:14–58:5; Appx. 250–51.

United Rentals paid for Mr. Verrusio's airfare, hotel, his share of the business dinner, his share of drinks and entertainment at a night club, and a baseball jersey. Tr. (1/28/2011, morning) at 70–72; Appx. 225. Ehrlich personally provided Mr. Verrusio with one ticket to Game 1 of the World Series. *Id.* Sonnenschein paid for Mr. Verrusio's transportation during the trip. *Id.*

It was Boulanger's idea to invite Mr. Verrusio and Blackann. Tr. (1/26/2011, morning) at 57:8–21; Appx. 188. Boulanger wanted to influence Mr. Verrusio in the hope that Mr. Verrusio would take unspecified, future actions that would be favorable to United Rentals. *See* Tr. (1/26/2011, morning) at 46:6–14; Appx. 185. Boulanger never testified that the trip was connected to any specific official acts to be performed by Mr. Verrusio.

Like Boulanger, Hirni viewed the New York trip as a relationship-building exercise meant to influence Mr. Verrusio generally. Tr. (2/1/2011, afternoon) at 141:14–22; Appx. 286; *see also* Tr. (2/1/2011, morning) at 146:7–16; Appx. 281. Hirni likewise never testified that the trip was connected to any official acts to be performed by Mr. Verrusio.

Boulanger and Hirni concurred that Mr. Verrusio's official position, as opposed to any expected official action, was the driving force behind the trip. *See* Tr. (1/26/2011, morning) at 65:10–23; Appx. 190; Tr. (1/31/2001, afternoon) at 50:18–51:3; Appx. 243–44. Blackann was clear that, in his opinion, the New York trip was provided to he and Mr. Verrusio because of "who we worked for, where we worked." Tr. (1/28/2011, morning) at 17:18–21; Appx. 223.

### D.   MR. VERRUSIO'S PURPORTED OFFICIAL ACTS

After the New York trip, Hirni and Boulanger worked with Blackann to insert a "rent vs. buy" amendment favorable to United Rentals into the Senate version of the Highway Bill. Tr. (1/26/2011, morning) at 101:12–102:14; Appx. 199. On November 11, 2011, Blackann accomplished that goal. *Id.* Mr. Verrusio played no role in that process. *Id.* at 100:2–4; Appx. 198.

Shortly thereafter, opposition to the amendment developed. *Id.* at 108–09; Appx. 200. At some later time, Boulanger met with Mr. Verrusio to discuss the opposition. *Id.* at 115:8–12; Appx. 202. Boulanger informed Mr. Verrusio that competing companies were sending letters opposing the amendment to Members of Congress on the Transportation Committee. *Id.* at 115:13–116:23; Appx. 202. Mr. Verrusio suggested that United Rentals send similar letters in support of the amendment. *Id.* Hirni also testified that he met with Mr. Verrusio to discuss a letter-writing campaign. Tr. (1/31/2011, afternoon) at 99:11–100:6; Appx. 266–67. Neither Boulanger nor Hirni testified that Mr. Verrusio took any further action related to fighting opposition to the amendment.

8

On October 22, 2003, Hirni sent Mr. Verrusio a white paper outlining the legislative ideas of United Rentals. *See* Gov't Ex. 62; Appx. 410; *see also* Tr. (1/31/2011, afternoon) at 95:9–18; Appx. 262. Hirni sent the document to Mr. Verrusio so that he was "kept in the loop." Tr. (1/31/2011, afternoon) at 97:10–17; Appx. 264. Mr. Verrusio responded five days later, "Looks like it needs a lot more work for anyone to be able to help with progress." *Id.* at 95:24–96:8; Appx. 262–63. The only contacts that Hirni and Mr. Verrusio had after that about United Rentals' white paper were "social conversations," because "most of the activity" was in the Senate (and Mr. Verrusio worked in the House). *Id.* at 96:5–21; Appx. 263. Mr. Verrusio's other communications with Hirni involved Mr. Verrusio providing him with publicly available information on the timing of legislation, the key players on the Transportation Committee, and the legislative process. *Id.* at 98:6–24; Appx. 265.

Hirni also contacted Vivian Curry regarding United Rentals because he had a relationship with her and other individuals in Representative Boozman's office. Tr. (1/31/2001, afternoon) at 100:24–103:16; Appx. 267–270. In an e-mail to Curry, he wrote:

> Vivian, I have spoken to Fraser and he is good to go. I am resending him the language in the Senate bill, with changes which would represent the 100 percent victory for [United Rentals.] Fraser asked us to give him the language plus what we would want in the perfect world . . . . The document attached includes the current language in the Senate bill and the perfect world bill that UR would love to end up with at the end of the day.

Gov't Ex. 88; Appx. 412; *see also* Tr. (1/31/2001, afternoon) at 104:4–16; Appx. 271.

In stating that Mr. Verrusio was "good to go," Hirni meant that he thought Mr. Verrusio was going to be "helpful with our legislative asks." Tr. (1/31/2001, afternoon) at 104:17–20; Appx. 271. Hirni never testified that Mr. Verrusio's "help" would involve using his official position to influence governmental decision-making, as opposed to, for example, reviewing draft

legislative ideas and passing on publicly available information.  Nor did Hirni ever testify that

Mr. Verrusio intended to perform any specific official acts.  In fact, when Boulanger was pressed

by the government to detail what, if any, specific actions Mr. Verrusio was going to perform,

Boulanger could not identify any.  Tr. (1/26/2011, morning) at 59:17–23; Appx. 188.  Boulanger

also admitted that he never personally discussed with Mr. Verrusio the idea of Mr. Verrusio

taking any specific official action.  Tr. (1/27/2011, afternoon) at 16:18–17:17; Appx. 209–10.

Further, although Blackann testified about conversations he allegedly had with Mr.

Verrusio prior to the trip, Blackann never identified any official acts that Mr. Verrusio was going

to perform.  Instead, Blackann testified that he and Mr. Verrusio discussed strategy.  *See* Tr.

(1/28/2011, morning) at 7:3–10:25; Appx. 220–21.  In fact, Blackann explicitly disagreed with

the suggestion that part of their purported strategy was for Mr. Verrusio to effect the insertion of

the amendments during conference committee.  *See id.* at 65:4–18; Appx. 232.

## III.    COURT RULINGS AND DECISIONS

Mr. Verrusio moved at the close of evidence for a judgment of acquittal on Counts One

and Two of the Indictment because the government failed to prove the "official act" element of

18 U.S.C. § 201.  *See* Tr. (2/2/2011, afternoon) at 72–94; Appx. 462–84; Tr. (2/7/2011) at 7–18;

Appx. 365–376.  After the jury's verdict, Mr. Verrusio moved again for a judgment of acquittal

on the same grounds.  *See* Appx. 487–538.  Mr. Verrusio also moved before trial to dismiss

Counts One and Two of the Indictment for failure to allege an official act.  *See* Appx. 69–92.

The district court denied those motions.  *See* Tr. (8/5/2011) at 3–12; Appx. 429–38; Tr.

(2/10/2011) at 24; Appx. 400; Tr. (2/7/2011) at 18; Appx. 376; Tr. (9/1/2010) at 47:5–55:23;

Appx. 173–181.

In denying Mr. Verrusio's post-trial motion with respect to Counts One and Two, the

court relied on Boulanger's testimony that the intent of the trip was to "influence" Mr. Verrusio,

Blackann's testimony that he and Mr. Verrusio discussed legislative strategy, and Hirni's testimony that he believed Mr. Verrusio would be helpful with United Rentals' legislative aims. Tr. (8/5/2011) at 6–7; Appx. 432–33.

On appeal, Verrusio challenged the sufficiency of Count 2 of the indictment on the ground that it failed to allege an official act—i.e., an essential element of the offense—in violation of his rights under the Grand Jury Clause of the Fifth Amendment. He argued that the definition of official act requires a public official to use his position to directly influence the governmental decision-making process. The court of appeals rejected that interpretation and effectively held that no connection between the alleged official conduct and the decision-making process is necessary. Mr. Verrusio also challenged his convictions on the ground that he should have permitted to call Curry as a witness. The court of appeals held that because Curry's testimony was not material it did not need to reach the question of whether his rights were violated.

## IV.   *MCDONNELL VS. UNITED STATES*

In *McDonnell v. United States*, No. 15–474 (June 27, 2016), the U.S. Supreme Court offered guidance on how to interpret and apply the official act requirement of section 201, and in doing so, the Court rejected the government's interpretation as being far too broad. The Supreme Court explained that:

> It is apparent from *Sun-Diamond* that hosting an event, meeting with other officials, or speaking with interested parties is not, standing alone, a "decision or action" within the meaning of §201(a)(3), even if the event, meeting, or speech is related to a pending question or matter. Instead, something more is required: §201(a)(3) specifies that the public official must make a decision or take an action on that question or matter, or agree to do so.
>
> For example, a decision or action to initiate a research study—or a decision or action on a qualifying step, such as narrowing down the list of potential research topics—would qualify as an "official act."

> A public official may also make a decision or take an action on a "question, matter, cause, suit, proceeding or controversy" by using his official position to exert pressure on another official to perform an "official act." In addition, if a public official uses his official position to provide advice to another official, knowing or intending that such advice will form the basis for an "official act" by another official, that too can qualify as a decision or action for purposes of § 201(a)(3). *See United States v. Birdsall*, 233 U. S. 223, 234 (1914) (finding "official action" on the part of subordinates where their superiors "would necessarily rely largely upon the reports and advice of subordinates . . . who were more directly acquainted with" the "facts and circumstances of particular cases").

*McDonnell*, Slip Op. at 19.

## ARGUMENT

## I.   PURSUANT TO 28 U.S.C. § 2255, THE COURT SHOULD VACATE MR. VERRUSIO'S CONVICTIONS BECAUSE THEY ARE BASED ON A VIOLATION OF HIS CONSTITUTIONAL RIGHTS.

Mr. Verrusio acknowledges that he is not currently subject to any restriction that the current weight of authority views as meeting the "in custody" requirement of section 2255(a). *See Maleng v. Cook*, 490 U.S. 488, 492 (1989). Mr. Verrusio asserts that those cases are wrongly decided and that the significant punishment that the government continues to impose upon him, *see* infra at 27–28, meets the in custody standard.

If Mr. Verrusio is found to be still "in custody" then, as explained below, his convictions should be vacated because his constitutional rights have been violated.

## II.   MR. VERRUSIO'S RIGHTS UNDER THE GRAND JURY CLAUSE HAVE BEEN VIOLATED BECAUSE THE INDICTMENT FAILS TO ALLEGE AN OFFICIAL ACT.

It is well-established that the Grand Jury Clause of the Fifth Amendment requires that an indictment "contain[] the elements of the offense charged." *Hamling v. United States*, 418 U.S. 87, 117 (1974). Thus, the pertinent question is whether "the indictment . . . omits language essential to the definition of the offense which it purports to charge." *United States v. Pickett*,

353 F.2d 62, 67–68 (D.C. Cir. 2004) (reversing conviction where indictment failed to allege an essential element of the offense).

Here, because none of the five official acts relied on by the government in the indictment can satisfy the requirements of *McDonnell*, the indictment fails to allege an essential element of the offense, and therefore the indictment violates Mr. Verrusio's rights under the Fifth Amendment.

## III.   MR. VERRUSIO'S RIGHT TO A FAIR AND IMPARTIAL TRIAL WAS VIOLATED.

A criminal defendant's right to present a defense, including access to compulsory process, is "fundamental and essential to a fair trial." *Washington v. Texas*, 388 U.S. 14, 17 (1967). The district court's error in not granting Mr. Verrusio's motions to dismiss some or all of the government's alleged official acts dramatically altered the course of Mr. Verrusio's trial, resulting in Mr. Verrusio having to defend against allegations of conduct that *McDonnell* makes clear do not fall within the scope of official act.

### A.   The government elicited no testimony that described official action.

#### 1.   *Testimony of Todd Boulanger*

Boulanger repeatedly stated that the purpose of the trip was simply to influence Mr. Verrusio in the hope that Mr. Verrusio would take unspecified, future actions that were favorable to United Rentals. See Tr. 01/26/2011 (morning), at 46:6–14; Tr. 01/26/2011 (morning), at 97:7–14; Tr. 01/27/2011 (morning), at 80:15–23. Boulanger also indicated that Mr. Verrusio was invited because of his official position. Tr. 01/26/2011 (morning), at 57:8–16; Tr. 01/26/2011 (morning), at 65:10–23.

In fact, when Boulanger was pressed by the government to detail what, if any, specific actions Mr. Verrusio was going to perform, Boulanger could not identify any.

> Q. Okay. And you mentioned that the defendant was one of the public officials that was identified to go on the trip. Tell us, how if at all did you think he would be helpful to getting your language into the highway bill?
>
> A. Um, I thought he would be helpful. It was something that we had to work on to do. It would certainly be more helpful having him on than opposed.

Tr. 01/26/2011 (morning), at 59:17–23.

Time and again, the government's witnesses only testified to the vague notion that Mr. Verrusio was going to be "helpful." That is not specific official action under *McDonnell*. Mr. Verrusio could have simply indicated that he thought their ideas were good public policy, but that does not mean there was ever any discussion of Mr. Verrusio taking specific official action.

### 2.    Testimony of Jim Hirni

Like Boulanger, Hirni also viewed the New York trip as a relationship-building exercise meant to influence Mr. Verrusio generally.

> Q. So why was it that you and Mr. Ehrlich decided to invite Mr. Verrusio?
>
> A. Well, in my conversation with Mr. Ehrlich, I had heard, he had told me that he had talked to Greenberg Traurig, Todd Boulanger in particular, these two staffers, Mr. Blackann and Mr. Verrusio were recommended for the trip, and not knowing them real well, invited them, hoping to get to know them better, just try to grow influence with that staffer who we didn't have a great relationship with.
>
> Q. As we discussed on direct, weren't there other staffers that could have filled the bill there from the Transportation and Infrastructure Committee?
>
> A. I'm sure there were 70-plus different staffers for those members of the committee.
>
> Q. So why Mr. Verrusio in particular, sir?
>
> A. Well, you know, he had a relationship with the folks at Greenberg Traurig, it was made clear to me. I got the sense when

14

> talking to him socially he would be open to baseball and understood the concept of being helpful to lobbyists. And again, not knowing him that well, reached out to him, and I'm – really because knowing him a little that I did, not knowing somebody blind on the committee, just picking up the phone and calling a member of Congress from South Dakota who I'd never met their staff, saying hey, we've got an event with United Rentals in New York City, we're going to the World Series game, I don't think that would have worked. I had to have a beginning of establishment of some sort of relationship to make that call.

Tr. 02/01/2011 (afternoon), at 141:14–142:16; *see also* Tr. 01/31/2001 (afternoon), at 38:3–8; Tr. 02/01/2011 (morning), at 146:7–16. Hirni concurred with Boulanger's view that Mr. Verrusio was invited primarily because of his official position. Tr. 01/31/2001 (afternoon), at 50:18–51:3. Missing from Hirni's testimony is any reference to a connection between the New York trip and specific official action to be performed by Mr. Verrusio.

### 3. *Testimony of Todd Ehrlich*

Ehrlich, the client, also viewed the purpose of the trip to build a relationship. Tr. 02/02/2001 (morning), at 21:20–22:13. As part of that relationship-building exercise, Ehrlich only ever contemplated obtaining information from Mr. Verrusio; the same information that he could have obtained from his lobbyists. Thus, it is abundantly clear that Ehrlich did not believe that the New York trip was provided to Mr. Verrusio because of specific official acts to be performed by Mr. Verrusio.

> Q. Forgive me if I've asked you this already, Mr. Ehrlich. Why was it, to your mind, that it was a good idea to invite Mr. Blackann and Mr. Verrusio on the trip?
>
> A. To get more information about the transportation bill.
>
> Q. And what sorts of information did you have in mind that you wanted?
>
> A. What the status of the bill was.

Q. Was that something that – was that something you could have
obtained from your lobbyists?

A. Yes.

Q. Did Mr. Boulanger indicate to you in your conversation with
him about – when you explained to him that you had the tickets,
did Mr. Boulanger indicate to you that it would be a good idea to
get the – to bring these guys along so that you could obtain
information about the transportation bill?

A. Yes.

Q. Okay. Was there anything else that, to your mind, Mr. Blackann
and Mr. Verrusio could help with besides providing information?

A. At that point in time there was a question about who was going
to sponsor our amendments, what official would do that, so maybe
they could give us some insight into that, I think.

Tr. 02/02/2001 (morning), at 25:2–23.

4.    *Testimony of Trevor Blackann*

Blackann also expressly stated that the reason, in his view, the New York trip was

provided to he and Mr. Verrusio was because of their *official position*—not because of any

contemplated specific official act.

Q. At the time you were invited, what did you think was the reason
you were being invited on the trip?

A. I knew they were inviting Fraser and I because of who we
worked for, where we worked. We weren't randomly selected.

Tr. 01/28/2011 (morning), at 17:18–21.

Further, although Blackann testified about conversations he allegedly had with Mr.

Verrusio prior to the trip, he never identified any acts that Mr. Verrusio was going to perform.

Instead, he simply contended that he and Mr. Verrusio discussed strategy.  Whether Mr. Verrusio

participated in providing advice to lobbyists prior to the New York trip says nothing about

whether Mr. Verrusio himself contemplated taking any official action.  Even if Blackann's

statements could be read as suggesting that Mr. Verrusio would take official action, Blackann

never connected the New York trip to any specific official acts.

The government's summary of the evidence offered in its opposition to Mr. Verrusio's

Rule 29 motion at the close of the government's case further illustrates the lack of testimony

concerning official action as applied in *McDonnell*.

> First, influencing the language of the federal highway bill. The
> evidence that came out at trial established that the bill, the highway
> bill was pending before the House Transportation Committee,
> where the defendant worked. That that committee had the primary
> responsibility for drafting that bill. The evidence established that
> the defendant was a key staffer on that committee, and that his job
> included working on the bill and conveying the concerns and the
> requests regarding that bill that he – that were communicated to
> him by outside groups, by lobbyists, by members and by other
> officials in Congress.

Tr. 02/02/2011 (afternoon), at 87:24–88:9.  Despite the lofty description of Mr. Verrusio's job

responsibilities, the government offered no evidence suggesting that Mr. Verrusio ever

considered discussing, much less advocating for, United Rentals' legislative agenda with anyone

that he worked for or with.

> The second act is advising Trevor Blackann to insert the United
> Rentals amendments at the conference committee stage. And the
> evidence at trial that supports that inference is that the defendant's
> job was to highlight the concerns of the members of Congress and
> other officials in Congress. The evidence also established that
> Trevor Blackann was a legislative staffer who was also working on
> the highway bill for the Senate's committee. And that the defendant
> would have acted therefore within his official responsibilities when
> he advised Trevor Blackann to wait to insert the amendments in
> the House version, given the situation in the House.

Tr. 02/02/2011 (afternoon), at 88:10–88:20.  At best, the government has shown that Mr.

Verrusio participated in crafting a perfectly legal strategy for the lobbyists to employ in pursuing

their legislative agenda.  There is nothing "official" about an individual, whether employed by

the federal government or not, advising other individuals about the best way to exercise their constitutional rights. The fact that Blackann also worked for Congress does not change the analysis. In explaining why Mr. Verrusio was not involved in placing the amendments in the Senate version of the Highway Bill, the government's witnesses emphasized the separate nature of the House and Senate—Mr. Verrusio could not have had influenced that process. Even if he could have, the evidence showed that he did not influence Blackann's actions. In fact, Mr. Blackann did exactly the opposite of what Mr. Verrusio purportedly advised. At bottom, the government failed to offer any evidence that supports the notion that Mr. Verrusio ever considered taking any actions to insert the amendments into the Highway Bill.

> With respect to the third act, specifically that the defendant met with Trevor Blackann, James Hirni and Todd Ehrlich in New York and discussed the highway bill, I think all witnesses who were on that trip agreed that at that dinner a discussion of the highway bill did occur. Specifically, I believe it was Trevor Blackann who testified that the defendant led that conversation, and that during that conversation the specific amendments that United Rentals wanted put into the highway bill were discussed, and the defendant shared with Todd Ehrlich and his lobbyist his strategy for getting those amendments in the highway bill.
>
> It's the Government's position that it was within the defendant's job to hold meetings like this with industry groups, to talk to them about pending legislation, and to offer his advice. And that's backed up by the descriptions of what the defendant did in Congress, which were testified to by Todd Boulanger, by Trevor Blackann, and by James Hirni.

Tr. 02/02/2011 (afternoon), at 88:21–89:12. If the acts discussed by the government qualify as official action, then commonplace lobbying is criminal because nearly all lobbying involves a public official accepting a thing of value, whether it is meals, drinks, trips, or campaign contributions in connection with listening to a lobbyist or constituent express his ideas on an issue. The question is not whether Mr. Verrusio discussed pending legislation with anyone; the

question is whether Mr. Verrusio ever contemplated performing specific official acts and accepted things of value because of those acts. Discussing legislation is simply not an official act under the plain language of the statute.

> The fourth specific act is that the defendant acted as a liaison between the Transportation Committee and United Rentals, which was a party interested in legislation before the Transportation Committee.

> And again, there's ample evidence in the record that the defendant advised Todd Boulanger and James Hirni regarding the amendments, that he offered to meet with them to discuss the improvement that was necessary on those amendments, that he provided valuable information to Todd Ehrlich about the process and the progress of the bill, and that he was responsive to the requests. And again, because of his duties as a liaison between the Transportation Committee and outside groups, again, those acts would fall within his official responsibility.

> And finally, the fifth act is that the defendant advised Todd Boulanger and James Hirni how to overcome opposition with respect to the highway bill.

> And there was testimony in the record that the defendant was broadly responsible for outreach efforts, again with meeting with outside groups and members in the industry and working with officials within Congress with respect to legislation. And the evidence showed that the defendant told the United Rentals lobbyist to undertake a letter writing campaign. Several exhibits were entered into evidence demonstrating that United Rentals followed that advice. And James Hirni specifically detailed that advice and explained why it was helpful to United Rentals' agenda.

Tr. 02/02/2011 (afternoon), 89:13–90:14. The government again completely missed the mark in its attempt to criminalize all lobbying. The final two acts identified by the government in support of their assertion that Mr. Verrusio contemplated official action demonstrated only that Mr. Verrusio shared advice and information. Advice and information are not official action.

**B.     Mr. Verrusio was prevented from calling his most important witness in order to prevent a former congressional staffer from testifying about her (nearly decade old) interactions with lobbyists.**

One of the key pieces of evidence introduced by the government was an e-mail exchange between Hirni and Curry, *see* Gov't Ex. 88; Appx. 412, which was one of several communications they had about United Rentals, *see* Tr. (1/31/2011, afternoon) at 100:24–106:19; Appx. 268–73. In that exchange, Hirni explained that Mr. Verrusio had purportedly requested draft language from Hirni and he also described Mr. Verrusio as "good to go." Id. The government intended for the jury to infer from Hirni's statements that he expected Mr. Verrusio to take action on behalf of United Rentals. Mr. Verrusio subpoenaed Curry, expecting that she would testify that "Mr. Verrusio was not in fact inserting himself in the process, that he was not placing the pressure on her, that she independently was communicating with Hinri, and that she has no recollection of any pressure being put on her by Mr. Verrusio." Tr. (2/3/2011, afternoon) at 24:9–19; Appx. 342. Mr. Verrusio also expected Curry to testify about their roles in the legislative drafting process, as noted in Curry's motion to quash. *See* Appx. 134.

Curry moved to quash her subpoena on the ground that her testimony was privileged under the Speech or Debate Clause. *Id.* She argued that her conduct was within the legislative sphere, and therefore protected, because it involved information gathering for legislative purposes. Appx. 139–41; *see also* Tr. (2/3/2011, afternoon) at 9–17; Appx. 327–335. The district court granted the motion to quash, finding that Curry "ha[d] appropriately invoked the Speech or Debate clause privilege." Tr. (2/3/2011, afternoon) at 20:9–14; Appx. 338. Mr. Verrusio argued that his inability to call Curry as a witness violated his "right to present indispensable evidence" under the Fifth Amendment, i.e., due process rights, Tr. (2/7/2011, morning) at 7:18–8:1; Appx. 365–66, and "[his] right to call witnesses for the defense" under the Sixth Amendment, *id.* at 17:3–10; Appx. 375.

rights.

Curry's proffered testimony was material, and therefore its exclusion violated Mr.

Verrusio's right to a fair trial. *See United States v. Dean*, 55 F.3d 640, 662 (D.C. Cir. 1995) ("A

witness'[s] testimony is material if its absence actually prejudiced the defendant's ability to

mount a defense."); *United States v. Valenzuela-Bernal*, 458 U.S. 858, 868 (1982) (explaining

that "the omission must be evaluated in the context of the entire record . . . . [I]f the verdict is

already of questionable validity, additional evidence of relatively minor importance might be

sufficient to create a reasonable doubt.").

Here, the evidence against Mr. Verrusio was far from overwhelming.   No evidence was

admitted that Mr. Verrusio discussed any amendments with anyone who worked for the House

before or after the trip; and no evidence was introduced that he discussed United Rentals, at all,

with anyone other than Boulanger, Blackann, Hirni, and Ehrlich.

And, as discussed above, Hirni's e-mail to Curry was one of only a handful of pieces of

evidence or testimony that connected Mr. Verrusio to United Rentals after the New York trip.  If

Curry, who was apparently an important player in Hirni's lobbying efforts, would have testified

that she discussed United Rentals with Mr. Verrusio and he never told her that he intended to do

anything to advance their agenda, as expected, that certainly would have aided Mr. Verrusio's

defense.

Finally, Curry would have also testified about Mr. Verrusio's role in the process and was

expected to explain that he had no substantive role or influence in the legislative drafting

process, casting doubt on the idea that anyone familiar with Mr. Verrusio's job responsibilities

would have ever thought he could or would act to insert amendments into a bill.

For all of these independent reasons, Curry's testimony was essential to Mr. Verrusio's defense, and because the government cannot show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained," each of Mr. Verrusio's convictions should be vacated.

## C.   The manner in which the government prosecuted this case further supports granting the requested relief.

An interpretation of official act that allows the government to shoehorn nearly any conduct into it is not only inconsistent with the plain language of the statute, but it also risks enabling inequitable treatment of criminal defendants.

### 1.   The government singles Mr. Verrusio out for inequitable treatment.

During the pendency of Mr. Verrusio's case, another individual with alleged connections to the Abramoff lobbying group, Mr. Horace Cooper, was charged with far more serious conduct involving public corruption than Mr. Verrusio. *See* Indictment, *United States v. Cooper*, No. 1:09-cr-00209-ESH, Dkt. No. 1 (D.D.C. Aug. 21, 2009). The Public Integrity Section offered Cooper a deal requiring no cooperation and a guilty plea to a single misdemeanor. *See* Information, *United States v. Cooper*, No. 1:09-cr-00209-ESH, Dkt. No. 1 (D.D.C. Aug. 21, 2009). Based in part on the government's treatment of Cooper, Mr. Verrusio requested a simple meeting with the government to discuss a resolution of this matter short of trial. *See* Ltr. from Joshua G. Berman, counsel for Mr. Verrusio, to Lanny Breuer, Assistant Attorney General (October 29, 2010) (attached herewith as Exhibit A).   The government refused the request. *Id.*

### 2.   The government engages in questionable conduct.

The Public Integrity Section of the Department of Justice began its investigation into Mr. Verrusio, coincidentally, after he refused to become a source for the government in its investigation of Representative Don Young. *See* Tr. 06/14/2010 (morning), at 2–3. Mr.

Verrusio had agreed to answer the FBI's questions concerning Rep. Young several times over the course of a year.  *Id.*  What followed was the government repeatedly engaging in highly questionable conduct.

In a motion for a bill of particulars, Mr. Verrusio sought to have the government identify the specific acts of official assistance it was relying on amidst the millions of pages of discovery the government generously provided.  Def.'s Mot. for Bill of Particulars, Dist. Ct. Dkt. No. 15 (Oct. 26, 2009).  Based on the government's representations that it would do so, the district court denied Mr. Verrusio's motion without prejudice.  Tr. 12/17/2009 (morning), at 73.  The government offered to provide Mr. Verrusio with its trial exhibits in exchange for his agreement to not renew his motion for a bill of particulars.  *See* Def.'s Mot. for Recons. 10–12, Dist. Ct. Dkt. No. 32 (Mar. 16, 2010).  He agreed, received the exhibits, and quickly saw that they shed no additional light on the purportedly official acts relied on by the government.  *Id.*  The district court expressed frustration and held that Mr. Verrusio would not be bound by his agreement.  Tr. 05/04/2010 (afternoon), at 4–7 (describing the government's conduct as "really troubling" and expressing "ongoing discomfort at what seems to be the government's rather protract[ed] reluctance to simply state what the official acts are that the defendant is alleged to have committed and that he'll be defending against, and that's an issue that just should not be murky").  The government ultimately identified the purported official acts in the superseding indictment.

In June 2010, when two new attorneys entered appearances on behalf of Mr. Verrusio, the government raised a potential conflict involving this case and the interests of a client those attorneys formerly represented.  Tr. 07/14/2010 (morning), at 15–18.  The government committed to raise that issue promptly.  *Id.* ("I would just say at the next hearing the Court sets

that that conflict resolution be part of that hearing."). Six months later, less than a month before

trial, between Christmas and New Year's, the government filed a 10-page request for a hearing

on the same potential conflict. Gov't Mot. for H'rg Regarding Potential Conflict of Interest,

Dist. Ct. Dkt. No. 96 (Dec. 27, 2010). Among the government's many musings was the

possibility that Mr. Verrusio's two lead counsel would be prevented from cross-examining one

of the government's three main witnesses. *Id.* at 7.

The district court was "troubled" by the government's conduct. Order 1, Dist. Ct. Dkt.

No. 98 (Dec. 28, 2010) ("I am troubled that the government has waited to seek this hearing and

raise this issue until now, and less than a month before trial is set to begin. I am also troubled

that the motion is longer on theoretical speculation about an actual or potential conflict and

shorter on detailed facts within the government's knowledge that would equip me to make a full

judicial assessment. It is difficult to believe that the government could not cite specific

information gleaned from specific individuals . . . .").

As part of its joint effort with the House, the government arranged the testimony of Paul

Lewis. *See* Ltr. from Irvin B. Nathan, General Counsel to the House of Representatives, to

Raymond N. Hulser, Deputy Section Chief, Public Integrity Section (Sept. 17, 2010) (attached

herewith as Exhibit B). The House set forth limits on Lewis's testimony in a letter to the

government. *Id.* The government, however, initially refused to provide Mr. Verrusio with a

copy of the letter, and purported to set out the terms of that agreement. *See* Gov't Status Report

2, Dist. Ct. Dkt. No. 70 (Sept. 27, 2010). The letter actually contained far greater restrictions on

Mr. Verrusio's ability to question Lewis than the government described, *see* Ex. B at 1–3,

limitations that were only revealed by the government after Mr. Verrusio sought assistance from

the district court.

On September 3, 2009, Mr. Verrusio asked the government for "any e-mails" it had from his House e-mail account from July 2003 to July 2004. *See* Ex. 2 to Def.'s Am. Mot. in Limine 2, Dist. Ct. Dkt. No. 64 (Sept. 7, 2010). The government responded that it had provided Mr. Verrusio with "[t]he only emails we obtained from the House." *Id.* Mr. Verrusio repeated his request on April 13, 2010, and in response the government first explained its "understanding" that "the email accounts for each former staffer likely have been deleted long ago," and then noted, "we were able to get some of Mr. Verrusio's e-mail from an old set of backup tapes in the possession of the House, and everything we received was produced." *Id.* Then, on September 21, 2010, the government revealed that it knew all along that the House had additional e-mails of Mr. Verrusio in its possession. *See* Gov't Mem. in Opp'n to Def.'s Am. Mot. in Limine 4, Dist. Ct. Dkt. No. 65 (Sept. 21, 2010). The government knew this because it ran search terms against that universe of documents, and received the results on March 18, 2009. *See id.* Notably, at no point leading up to the government's surprise revelation did it assert that it lacked possession, custody, or control over Mr. Verrusio's House e-mails, and at no point did the government suggest that Mr. Verrusio should pose his request to the House, not the government. Instead, the government chose to mislead Mr. Verrusio with stories of deleted e-mail accounts when the government knew with absolute certainty that the House continued to have some unknown cache of e-mails in its possession.

Following the government's apparent epiphany, the district court convened an off-the-record conference call to address the government's conduct. The call resulted in the government having to address five specific questions in writing. *See* Gov't Responses to the Court's Questions Concerning the Government's Requests for House Emails, Dist. Ct. Dkt. No. 73 (Oct. 5, 2010).

After Mr. Verrusio learned that the House had thousands of his e-mails which he had not known about, he sought a brief continuance of trial to review those documents. *See* J. Status Report Regarding Disc. and Trial Schedule, Dist. Ct. Dkt. No. 85 (Nov. 5, 2010). The government opposed the continuance based only on its prediction that Mr. Verrusio would not find any relevant e-mails (the government did not expound on the logic behind its view). *Id.* at 4. In other words, the government attempted to use gamesmanship to undermine Mr. Verrusio's ability to prepare for trial. That type of conduct should not be tolerated or encouraged.

**D.    Mr. Verrusio's right to a fair and impartial tribunal.**

Mr. Verrusio must also, respectfully, address recent events relevant to this case. The district judge (former Judge Richard W. Roberts) who oversaw Mr. Verrusio's trial, and who was called on to assess serious challenges made by Mr. Verrusio to the conduct of the Public Integrity Section, resigned in March 2016 due to allegations of misconduct raised in a civil lawsuit. Those allegations concern the former judge's conduct as a prosecutor, and raise at least the specter that Mr. Verrusio's right to a fair and impartial tribunal was violated.

For preservation purposes, Mr. Verrusio is hereby asserting that recent allegations of ethical misconduct involving the trial judge should have resulted in the judge recusing himself from all cases prosecuted by the Public Integrity Section, and his failure to do so violated Mr. Verrusio's constitutional and statutory rights. However, Mr. Verrusio requests that this claim be held in abeyance pending further factual developments.

**IV.    MR. VERRUSIO'S PETITION FOR A WRIT OF ERROR *CORAM NOBIS* SHOULD BE GRANTED.**

The D.C. Circuit has yet to address the standard for granting a writ of error *coram nobis*. Several district courts in this Circuit have analyzed four factors to determine whether the writ should issue: (1) whether a more usual remedy is available; (2) whether valid reasons exist for

not attacking the conviction earlier; (3) whether adverse consequences exist from the conviction sufficient to satisfy the case or controversy requirement of Article III; and (4) whether the error is of the most fundamental character. *See Rossini v. United States*, No. 08–692 (JMF), 2014 WL 5280531, at *1 (D.D.C. Oct. 14, 2014).

### A.     Mr. Verrusio does not have a more usual remedy available.

In *Rossini*, the court held that "because [petitioner] has now completed the various elements of his sentence, the more usual remedies of either a direct appeal or a motion for habeas corpus relief pursuant to 28 U.S.C. § 2255, respectively, are not available . . . , the petitioner has satisfied the first of the *coram nobis* requirements." *Rossini*, 2014 WL 5280531, at *2.  If Mr. Verrusio is not "in custody," then he has no other remedies.

### B.     Mr. Verrusio has diligently sought to protect his rights.

Mr. Verrusio could not have previously relied on directly on point precedent from the U.S. Supreme Court.

### C.     The government continues to deny, impair, or impede Mr. Verrusio's exercise of several fundamental liberties.

The third element of the *coram nobis* test requires the petitioner to show "1) that he suffered some actual or threatened injury as a result of the respondent's conduct; 2) that the injury resulted from the petitioner's conduct; and 3) that the injury is likely to be redressed by a favorable action." *Rossini*, 2014 WL 5280531, at *4.  Mr. Verrusio can satisfy his burden.

Because Mr. Verrusio is a convicted felon, federal and state law severely restrict his right to bear arms under the Second Amendment.  The restrictions on gun ownership in each state, not just those of Virginia where Mr. Verrusio currently resides, are relevant because they impact Mr. Verrusio's ability to relocate.  He should not have to choose between sacrificing his constitutional right and the ability to move freely around the United States.

Mr. Verrusio also faces enfranchisement limitations across the country. Three states (Florida, Kentucky, and Iowa) permanently disenfranchise anyone with a felony conviction.[2] Six states (Alabama, Mississippi, Arizona, Nevada, and Wyoming) have permanent disenfranchisement for at least some people with criminal convictions. *Id.* Those limitations on Mr. Verrusio's right to vote flow directly from his wrongful conviction. A felony conviction has other consequences as well.[3] Additionally, it has an impact on where Mr. Verrusio can serve on a jury, and on what other countries he can visit because some countries restrict the travel of convicted felons.[4]

Finally, the continuing emotional, physical, and mental toll that these convictions have on Mr. Verrusio should not be underestimated and further support his requested relief. These consequences impact every aspect of his life, including work and family.

### D.    When an individual's conviction is premised on lawful conduct, that error is of the most fundamental character.

In *United States v. Hansen,* a sister court addressed a nearly identical factual situation as that facing Mr. Verrusio—the U.S. Supreme Court "determined that conduct once construed as

---

[2] Brennan Center for Justice, Criminal Disenfranchisement Laws Across the United States, Brennan Center for Justice at New York University School of Law, May 31, 2016, http://www.brennancenter.org/criminal-disenfranchisement-laws-across-united-states

[3] *See, e.g.*, Margaret Lane, Loss and Restoration of Civil Rights and Firearms Privileges, NACDL Restoration of Rights Resource Project, April 2016, http://ccresourcecenter.org/resources-2/restoration-of-rights/chart-1-loss-and-restoration-of-civil-rights-and-firearms-privileges/; Margaret Lane 50-State Comparison Consideration of Criminal Records in Licensing and Employment, NACDL Restoration of Rights Resource Project, June 2016, http://ccresourcecenter.org/resources-2/restoration-of-rights/50-state-comparisoncomparison-of-criminal-records-in-licensing-and-employment/.

[4] Margaret Lane, Loss and Restoration of Civil Rights and Firearms Privileges, NACDL Restoration of Rights Resource Project, April 2016, http://ccresourcecenter.org/resources-2/restoration-of-rights/chart-1-loss-and-restoration-of-civil-rights-and-firearms-privileges/; *see also* Government of Canada, Immigration and Citizenship: Determine if you are inadmissible, http://www.cic.gc.ca/english/information/inadmissibility/index.asp.

criminal was outside the scope of the applicable criminal statute, once that statute was properly interpreted." 906 F. Supp. 688, 696 (D.D.C. 1995). In granting the writ of error *coram nobis*, the *Hansen* court thus held that "full retroactivity is a necessary adjunct to a ruling that a trial court lacked the authority to convict or punish a criminal defendant in the first place" because the interpretation of the statute on which the petitioner's conviction was based "is, and always was invalid." *Id.* at 697. Because Mr. Verrusio's indictment and the evidence at his trial was based on an interpretation of official act that was always invalid, his convictions should be vacated.

## CONCLUSION

For the foregoing reasons, Mr. Verrusio's convictions should be vacated pursuant to 28 U.S.C. § 2255, or in the alternative, the Court should issue a writ of error *coram nobis* and vacate his convictions.

June 29, 2016                                        Respectfully submitted,

|  | */s/ Richard P. Sobiecki* |
|---|---|
|  | Richard P. Sobiecki |
|  | Baker Botts L.L.P. |
|  | The Warner |
|  | 1299 Pennsylvania Ave., NW |
|  | Washington, DC 20004 |
|  | rich.sobiecki@bakerbotts.com |
|  | (202) 639-7700 |
|  |  |
|  | A.J. Kramer |
|  | Federal Public Defender |
|  | Rosanna Taormina |
|  | Assistant Federal Public Defender |
|  | 625 Indiana Avenue, NW |
|  | Suite 550 |
|  | Washington, DC 20004 |
|  | A._J._Kramer@fd.org |
|  | Rosanna_M_Taormina@fd.org |
|  | (202) 208-7500 |
|  |  |
|  | *Counsel for Fraser Verrusio* |

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) Criminal No. 07-131-01 (GK) |
| | ) |
| v. | ) |
| | ) |
| JAMES BECTON, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**O R D E R**

Upon consideration of Defendant's Motion for Extension of Time to File a Section 2255 Motion [Dkt. No. 560] and the Government's Notice [Dkt. No. 561], and it appearing that Defendant's proposed motion is a successive motion for relief under 28 U.S.C. § 2255 and therefore subject to the certification provisions of § 2255, it is hereby

**ORDERED**, that, without expressing any opinion on the merits, Defendant's Motion be transferred, pursuant to 28 U.S.C. §§ 1631 and 2255, to the U.S. Court of Appeals for the District of Columbia Circuit so that the Court of Appeals may evaluate the motion.

6/27/16
DATE

GLADYS KESSLER
United States District Judge

**Copies via ECF to counsel and by mail to:**

JAMES BECTON
Register No. 07115-007
Rivers Correctional Institution
P.O. Box 630
Winton, NC 27986