# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>FRASER VERRUSIO,<br><br>Defendant. | Criminal Case No. 09-cr-00064 (BAH)<br><br>Chief Judge Beryl A. Howell |

## MEMORANDUM OPINION

In 2011, the defendant, Fraser Verrusio, the former policy director of the House

Transportation Committee, was convicted on three counts relating to his receipt of gifts from

Jack Abramoff's lobbying group. Petitioning for a writ of *habeas corpus*, pursuant to 28

U.S.C. § 2255, or in the alternative, a writ of *coram nobis*, pursuant to 28 U.S.C. § 1651, the

defendant seeks to vacate his convictions. *See generally* Def.'s Mot. to Vacate, Set Aside, and

Correct Sentence Pursuant to 28 U.S.C. § 2255, or in the Alternative, Petition for a Writ of

Error *Coram Nobis* ("Def.'s Mot."), ECF No. 162. The defendant primarily argues that his

convictions cannot be sustained in the wake of the Supreme Court's decision in *McDonnell v.*

*United States*, 136 S. Ct. 2355 (2016). *See id.* at 1–3. For the following reasons, the

defendant's petitions are denied.

## I.      BACKGROUND

In 2011, the defendant, a resident of Virginia, *id.* at 27, was convicted by a jury on three

separate counts: (1) conspiracy to receive an illegal gratuity, in violation of 18 U.S.C. § 371; (2)

receipt of an illegal gratuity, in violation of 18 U.S.C. § 201(c); and (3) making a false statement,

in violation of 18 U.S.C. § 1001(a). Judgment at 1–2, ECF No. 139. As a result of his

convictions, the defendant was sentenced by another Judge of this Court to a single day of

incarceration on each count to run concurrently. *Id.* at 3.[1] The defendant was also sentenced to two years supervised release on Counts One and Three, and one year of supervised release on Count Two, also to run concurrently. *Id.* at 4. The factual background of the defendant's convictions is summarized before turning to an assessment of his two petitions.

### A. United Rentals and the 2003 Trip to the World Series

In 2003, the defendant worked as the policy director of the Transportation and Infrastructure Committee for the U.S. House of Representatives ("House Transportation Committee"). Trial Tr. (Jan. 28, 2011 Morning) 6:23–7:2, ECF No. 170. In this role, the defendant, among other things, liaised between Congressional members of the House Transportation Committee and lobbyists, Trial Tr. (Jan. 26, 2011 Morning) 68:4–11, ECF No. 168, and worked closely with the chairman of the House Transportation Committee, Representative Don Young of Alaska, *id.* at 60:8–9. The defendant worked alongside Vivian Curry Moeglin, legislative director for Representative John Boozman of Arkansas, a member of the House Transportation Committee, as well as Trevor Blackann, a legislative assistant to Senator Kit Bond of Missouri, who, at the time, chaired the Senate Subcommittee on Transportation and Infrastructure of the Senate Committee on the Environment and Public Works. Trial Tr. (Jan. 26, 2011 Morning) 69:7–14, ECF No. 168; Trial Tr. (Jan. 28, 2011 Afternoon) 93:20–94:10, ECF No. 149; Trial Tr. (Jan. 31, 2011 Afternoon) 101:23–25, ECF No. 150.

During his time as policy director, the defendant met Todd Ehrlich, an executive of United Rentals, a construction equipment rental company. Trial Tr. (Feb. 2, 2011 Morning) 5:17–21, 16:2–12 ECF No. 173. The defendant also came to know Todd Boulanger, a former

---

[1]     This case was reassigned to the undersigned on June 30, 2016.

Senate staffer and lobbyist with Greenberg Traurig, as well as James Hirni, another former Senate staffer and lobbyist with Sonnenschein, Nath & Rosenthal. Trial Tr. (Jan. 31, 2011 Afternoon) 32:18–34:13, ECF No. 150; Trial Tr. (Jan. 26, 2011 Morning) 44:2–4, 52:16–18, ECF No. 168.

United Rentals had a number of legislative priorities in 2003 and hired Hirni and Boulanger to lobby for these priorities in Washington, D.C. Trial Tr. (Jan. 28, 2011 Morning) 6:13, 7:3–6, 60:2–17, 62:1–2, ECF No. 170; Trial Tr. (Jan. 28, 2011 Afternoon) 17:1–5, ECF No. 149. United Rentals wanted language added to the Federal Highway Bill ("FHB"), which was subject to reauthorization in the Fall of 2003, that, among other things, encouraged rental of construction equipment over purchasing and increased the required level of liability insurance for the construction equipment rental industry. Trial Tr. (Jan. 31, 2011 Afternoon) 40:18–41:8, 43:4–9, 44:7–18, 44:19–45:1, ECF No. 150; Trial Tr. (Jan. 28, 2011 Morning) 5:3–9, ECF No. 170,

The majority of the work on the FHB in the fall of 2003 was done in the Senate Environment and Public Works Committee, where Blackann was a senior member. Trial Tr. (Jan. 28, 2011 Afternoon) 93:20–94:10, ECF No. 149; Trial Tr. (Jan. 26, 2011 Morning) 69:7–14, ECF No. 168. Blackann testified that, at the time, he and the defendant anticipated opposition to United Rentals' legislative goals from companies that sold, rather than rented, construction equipment. Trial Tr. (Jan. 28, 2011 Morning) 8:9–18, ECF No. 170. The defendant recommended that United Rentals and its lobbyists pursue an "airmail strategy," whereby the defendant, Blackann, and the lobbyists would wait until the bill went into conference committee to insert the desired language in the bill. *Id.* at 8:22–9:23, 65:1–18. The defendant believed this

strategy would increase the likelihood of the provisions being passed. *Id.* at 9:1–23; Trial Tr. (Jan. 28, 2011 Afternoon) 65:1–18, ECF No. 149.

Boulanger, Hirni, and Ehrlich together then decided to invite Blackann and the defendant on an overnight trip to New York City to see the first game of the 2003 World Series. Trial Tr. (Jan. 31, 2011 Afternoon) 57:14–18, ECF No. 150. At trial, Boulanger testified that he hoped the World Series trip to New York would influence the defendant to take action that would be favorable to United Rentals in the future. Trial Tr. (Jan. 26, 2011 Morning) 46:6–14, ECF No. 168. Similarly, Hirni testified at trial that the World Series trip was meant to build relationships and grow influence with the staffers. Trial Tr. (Feb. 1, 2011 Afternoon) 141:14–22, ECF No. 151. When asked why the defendant was selected for the trip, both Boulanger and Hirni testified that it was because of his position. Trial Tr. (Jan. 26, 2011 Morning) 59:17–60:5, ECF No. 168; Trial Tr. (Feb. 1, 2011 Afternoon) 147:2–10, ECF No. 151. Boulanger also testified that the defendant had a habit of accepting dinners and meeting with clients. Trial Tr. (Jan. 26, 2011 Morning) 83:1–84:22, ECF No. 168.

The World Series trip was Saturday, October 18 to Sunday, October 19, 2003. Trial Tr. (Jan. 28, 2011 Afternoon) 59:14–60:9, ECF No. 149. Hirni arranged flights for himself, Blackann, and the defendant from Washington, D.C. to New York City, and arranged for the group to stay at the Bryant Park Hotel, a luxury hotel in midtown Manhattan. Trial Tr. (Jan. 31, 2011 Afternoon) 53:23–54:8, ECF No. 150; Trial Tr. (Feb. 1, 2011 Morning) 156:9–12, ECF No. 172; Trial Tr. (Feb. 2, 2011 Morning) 27:9–12, ECF No. 173. Shortly after arriving at the Bryant Park Hotel, Blackann shared the airmail strategy with Ehrlich. Trial Tr. (Jan. 28, 2011 Morning) 60:7–25, ECF No. 170. Neither Hirni nor the defendant were present for this conversation. *Id.* at 28:3–17. Ehrlich did not care for this strategy as he wanted something

4

tangible sooner rather than later. *Id.* at 27:15–19, 60:7–25. Blackann later shared with the defendant that Ehrlich did not want to pursue the "airmail" strategy and the defendant stated that abandoning that strategy was the wrong decision. *Id.* at 61:5–17.

After Blackann and Ehrlich finished their meeting, the defendant met Blackann, Hirni, and Ehrlich for dinner at Sparks, a Manhattan steakhouse. Trial Tr. (Feb. 1, 2011 Afternoon) 26:8–10, ECF No. 151. Although several executives from United Rentals planned to attend, Ehrlich was the only executive able to attend the dinner. *Id.* at 26:8–10, 29:25–30:16. At dinner, all four individuals discussed United Rentals, the desired legislative amendments, and the legislative process. *Id.* at 40:15–41:9.

Ehrlich paid for the entire group at the end of the meal and the group departed to attend the World Series. Trial Tr. (Jan. 28, 2011 Afternoon) 55:1–8, ECF No. 149; Trial Tr. (Feb. 1, 2011 Afternoon) 46:10–11, ECF No. 151; Trial Tr. (Feb. 2, 2011 Morning) 81:5–13, ECF No. 173. The tickets to the game were Ehrlich's personal tickets, not paid for by United Rentals. Trial Tr. (Feb. 2, 2011 Morning) 81:20–21, ECF No. 173. When asked, Ehrlich testified that he did not ask the defendant or Blackann to reimburse him for the tickets as he thought it would be "tacky" since he had not paid for them himself. *Id.* at 81:22–83:3. Ehrlich also testified, however, that it was unlikely that he would have invited the defendant or Blackann to the game if it were not for Boulanger's suggestion to do so. *Id.* at 26:22–25. After the World Series game, Ehrlich took the group to a strip club named "Privilege." Trial Tr. (Feb. 1, 2011 Afternoon) 57:18–23, 145:16–21, ECF No. 151. Hirni, Blackann, and the defendant returned to Washington, D.C. the following day on the same flight. *Id.* at 61:9–13.

Over the course of the trip, United Rentals, either directly or through their lobbyists, paid for Blackann and the defendant's airfare to and from New York, transportation while in New

York, meals, drinks, and hotel costs, as well as their expenses at the strip club and a souvenir baseball jersey and t-shirt. Trial Tr. (Jan. 31, 2011 Afternoon) 58:23–59:1, ECF No. 150. At trial, the parties stipulated that the cost of the defendant's trip to New York was $1,259.77. Trial Tr. (Jan. 28, 2011 Morning) 70:6–72:13, ECF No. 170.

### B. After the 2003 Trip and Amendments to the FHB

After the trip, Blackann sent an email to Hirni on October 20, 2003 that Hirni believed was a "cover e-mail" meant to make it appear as though Blackann and the defendant had not gone on the World Series trip. Trial Tr. (Jan. 31, 2011 Afternoon) 93:3–16, ECF No. 150. In the email, Blackann thanked Hirni for the invitation to the game but stated "Sorry neither Fraser nor I could make it but maybe next time." *Id.* at 92:22–25. Hirni also stated that he did not have a good feeling after the trip, and that this was not good governance. *Id.* at 91:3–9, 91:15–17.

Upon returning to work in Washington, D.C., Blackann worked to add language desired by United Rentals inserted in the Senate version of the Bill. Trial Tr. (Jan. 28, 2011 Morning) 61:1–9, ECF No. 170. Blackann informed the defendant about his plans for accomplishing the amendment insertions. *Id.* at 61:1–9. Blackann chose to have Senator Craig Thomas insert the amendments into the Bill in order to preserve political capital for Senator Bond. *Id.* at 63:17–64:16. Blackann stated that he wanted to pursue the amendments because he thought they represented good policy and were helpful to United Rentals, a constituent. *Id.* at 64:17–25. Blackann was able to have Senator Thomas insert the desired language in the Senate version of the Bill during the Senate "markup" meeting so that the amendments would be accepted without a vote on each specific amendment. Trial Tr. (Jan. 26, 2011 Morning) 99:7–16, ECF No. 168.

Shortly after the amendments were inserted in the Senate version of the Bill, there was backlash from opposition, primarily from companies that sell construction equipment as opposed

to renting it, as well as small rental firms that could not afford the proposed insurance requirements. Trial Tr. (Jan. 28, 2011 Morning) 72:24–73:7, ECF No. 170. Due to this heated opposition, Blackann stated that he hoped the defendant would not have the language inserted into the House version of the Bill so as to keep the exposure limited. *Id.* at 95:9–13, 96:5–97:2.

As the Bill was being worked on in the Senate, the defendant stayed in contact with Boulanger and Hirni, discussing the language of the amendments and the likelihood of successful inclusion in the House. Trial Tr. (Jan. 26, 2011 Morning) 115:14–116:4, ECF No. 168. The defendant met with Boulanger and Hirni in the House Transportation Committee's Conference Room to discuss growing opposition to the amendments, and ways in which that opposition might be overcome. Trial Tr. (Jan. 31, 2011 Afternoon) 99:21–100:13, ECF No. 150; Trial Tr. (Jan. 26, 2011 Morning) 115:14–116:4, ECF No. 168. Among other things, the defendant suggested a letter-writing campaign. Trial Tr. (Jan. 26, 2011 Morning) 116:14–23, ECF No. 168. Hirni testified that it was common to get advice on letter-writing campaigns from leadership or committee staff members in order to know how best to strategize. Trial Tr. (Feb. 1, 2011 Afternoon) 137:21–138:19, ECF No. 151. The defendant also suggested that Hirni and Boulanger meet with rank-and-file members of the House Transportation Committee to have them pressure the Chairman into supporting the amendments. Trial Tr. (Jan. 26, 2011 Morning) 125:7–19, ECF No. 168.

On October 22, 2003, Hirni shared a white paper outlining United Rentals' legislative agenda with the defendant. Trial Tr. (Jan. 31, 2011 Afternoon) 95:9–18, ECF No. 150. Five days later, the defendant informed Hirni that the white paper would need significant work before anyone could help Hirni with progressing the amendments through the House, and that the defendant was willing to help discuss language. *Id.* at 95:24–96:8. The defendant did not agree,

however, to insert any of the language from the white paper in the House version of the Bill. Trial Tr. (Feb. 1, 2011 Afternoon) 76:4–6, ECF No. 151. The defendant continued to share information with Hirni regarding the House Transportation Committee, including information regarding timing, influential individuals, and the legislative process. Trial Tr. (Jan. 31, 2011 Afternoon) 98:18–24, ECF No. 150.

During this same period, Hirni was also in contact with Moeglin regarding United Rental's legislative agenda. *Id.* at 102:2–24. Hirni told Moeglin that the defendant was "good to go" in an email dated January 14, 2004. Trial Tr. (Jan. 25, 2011 Afternoon) 12:16–13:3, ECF No. 148. At trial, Hirni testified that he meant that the defendant would be "helpful with our legislative asks." Trial Tr. (Jan. 31, 2011 Afternoon) 104:17–20, ECF No. 150.[2] The FHB went to "markup" in the House in March of 2004, Trial Tr. (Jan. 28, 2011 Morning) 94:14–25, ECF No. 170, and the House passed the FHB in late March or early April of 2004, Trial Tr. (Jan. 28, 2011 Morning) 100:20–101:8, ECF No. 170. The Bill then went into the "preconference" stage with House and Senate staffers discussing the language to be included in the final conference report. *Id.* at 101:6–11. The defendant participated in these meetings when the United Rentals provisions were discussed. *Id.* at 102:1–16. Blackann testified that he also was a part of approximately a third of these meetings, and only saw the defendant at the meeting where the United Rentals provisions were discussed. *Id.* at 102:17–25. The United Rentals provisions were eventually stripped from the final FHB in conference committee and not included in the enacted legislation. Trial Tr. (Jan. 25, 2011 Afternoon) 23:11–20, ECF No. 148.

---

[2]      Moeglin did not testify at trial as the subpoena for her testimony was quashed due to the Speech or Debate privilege. Trial Tr. (Feb. 3, 2011 Afternoon) 20:9–14, ECF No. 153.

### C.  Boulanger and Hirni's Testimony

At trial, Boulanger testified that he conspired to commit honest services fraud with the defendant.  Trial Tr. (Jan. 26, 2011 Morning) 44:22–45:4, ECF No. 168.  Hirni also testified that he pleaded guilty to honest services fraud because he had used the World Series tickets in an attempt to influence Congressional staff for legislation.  Trial Tr. (Feb. 1, 2011 Afternoon) 136:1–16, ECF No. 151.

### D.  The Defendant's Statement on his Financial Disclosure Form

Congressional staffers who earn above a certain salary are required to file an annual financial disclosure form.  Trial Tr. (Feb. 2, 2011 Afternoon) 7:15–21, ECF No. 152.  These individuals must report, among other things, financial transactions, income, liabilities, charitable contributions, and gifts that aggregate to $285 or more from any particular individual.  *Id.* at 9:6–12, 67:24–68:4.  If any individual knowingly or willfully falsifies any information on the forms, he or she is subject to criminal and civil liability.  *Id.* at 17:1–5.

As the defendant met the salary minimum, he was required to file a financial disclosure form, *id.* at 30:17–31:7, but he did not report the 2003 World Series trip on his 2003 financial disclosure form, *id.* at 19:17–22.  On his original submission of the financial disclosure, the defendant marked that he had received reportable gifts, but did not supply any required information as to what they were.  *Id.* at 21:20–22:1.  The defendant was given an opportunity to rectify his failure to disclose the World Series trip when the individual in charge of reviewing financial disclosures contacted him about inconsistencies with his form.  *Id.* at 20:11–16.  The defendant responded to this request for more information related to reportable gifts by stating that he had inaccurately marked that he had received any, and that he had in fact not received any gifts that needed to be reported.  *Id.* at 24:5–12.

Hirni testified that he believed the World Series trip was ethically fine, but that Blackann and the defendant should have reported the trip on their financial disclosures. Trial Tr. (Jan. 31, 2011 Morning) 55:5–18, ECF No. 150. The defendant, however, told an FBI Special Agent in an interview that he did not believe that the trip would have withstood the scrutiny of the House Ethics Committee. Trial Tr. (Jan. 31, 2011 Morning) 102:11–14, ECF No. 171.

### E. Procedural History

On March 6, 2009, a grand jury indicted the defendant on three counts. Count One charged the defendant with conspiracy to receive illegal gratuities, in violation of 18 U.S.C. § 371, based on allegations that the defendant and Blackann "agreed to provide favorable official action to aid [United Rentals] by, among other things, inserting, or causing others to insert, and protecting from removal, the three legislative amendments sought by" United Rentals. Indictment ¶ 12(b), ECF No. 2. Count Two alleged that the defendant violated the illegal gratuities statute, 18 U.S.C. § 201(c), by accepting gifts "for and because of his official assistance provided and to be provided to [United Rentals'] efforts to secure favorable amendments to the Federal Highway Bill." *Id.* ¶ 26. Count Three alleged that the defendant violated the false statement statute, 18 U.S.C. § 1001, by knowingly and willfully making a materially false statement on his 2003 financial disclosure form. *Id.* ¶¶ 27–32.

The defendant subsequently filed a motion to dismiss the indictment and also filed a motion for a bill of particulars, requesting, in part, the "specific official acts" the government alleged the defendant performed. Def.'s Mot. Bill of Particulars at 3, ECF No. 15. Although this request was denied, a superseding indictment added information as to Counts One and Two. With respect to Count One, the government added that "Verrusio advised Blackann that Verrusio and Blackann should wait to insert the amendments sought by [United Rentals] until later in the

legislative process, and Blackann understood that Verrusio would insert the amendments at the conference committee stage of the Highway Bill." Superseding Indictment ¶ 15, ECF No. 40. As to Count Two, the government added five forms of "official assistance provided and to be provided to" United Rentals' "efforts to secure favorable amendments to the Federal Highway Bill," including "influencing the language of the Federal Highway Bill." *Id.* ¶¶ 28, 28(a).

The defendant moved to dismiss Counts One and Two for failure to allege an "official act" within the meaning of 18 U.S.C. § 201(c). *See generally* Def.'s Mot. Dismiss Counts 1 and 2 of Superseding Indictment, ECF No. 45. This motion was denied, *see* Minute Entry (Sept. 1, 2010), and the case proceeded to trial. The defendant then moved for a judgment of acquittal, arguing again, with respect to Counts One and Two, that the government did not prove the "official act" element, *see generally* Def.'s Mot. Judgment of Acquittal on Counts 1 and 2, ECF No. 123, and with respect to Count 3, that government had not proven the falsity, intent, and materiality elements of the false statement violation, *see generally* Def.'s Mot. Judgment of Acquittal on Count 3, ECF No. 124. On October 5, 2011, the Court denied both motions and, as noted, sentenced the defendant to a total of one day of incarceration and two years supervised release. *See* Minute Entry (Aug. 5, 2011); Minute Orders (Aug. 5, 2011) (denying motions for acquittal).

On direct appeal of his convictions, the defendant raised four arguments:

> (1) the district court erred in denying his pretrial motion to dismiss Count Two because the indictment failed to allege an 'official act'; (2) the evidence was insufficient to convict on Counts One and Two because it failed to show that he conspired to perform or did perform an official act; (3) the evidence failed to show that he made a false statement on his financial disclosure form; and (4) the district court committed reversible error in excluding a defense exhibit and quashing a defense subpoena.

*United States v. Verrusio*, 762 F.3d 1, 11 (D.C. Cir. 2014). The D.C. Circuit rejected all four arguments. *Id.* at 15, 17, 18, 20.

The defendant subsequently filed a petition for writ of *certiorari*, which was denied by the Supreme Court on June 29, 2015. *See generally Verrusio v. United States*, 135 S.Ct. 2911 (2015) (denying petition for writ of *certiorari*). One year later, the defendant filed the instant petitions for *habeas corpus* and, in the alternative, *coram nobis*. *See generally* Def.'s Mot. As of the filing of these petitions, the defendant had completed all parts of his sentence. *Id.* at 12.

## II. DISCUSSION

The defendant seeks a writ of *habeas corpus*, pursuant to 28 U.S.C. § 2255, or in the alternative, a writ of *coram nobis* under 28 U.S.C. § 1651, to vacate his convictions, primarily based on the contention that he did not receive a gratuity in exchange for an "official act." The defendant avers that in *McDonnell v. United States*, 136 S. Ct. 2355 (2016), the Supreme Court narrowed the definition of what qualifies as an "official act" under 18 U.S.C. § 201(a) such that the defendant's conduct falls outside the ambit of § 201. Def.'s Mot. at 12–19, 29. For the reasons stated below, however, the merits of this argument need not be entertained because the defendant cannot establish jurisdiction for either petition.

### A. Writ of *Habeas Corpus*

#### 1. Legal Standard

Under 28 U.S.C. § 2255(a), "[a] prisoner in custody under sentence of a court . . . claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence." *Id.* Then,

> [i]f the court finds that . . . there has been such a denial or infringement of
> the constitutional rights of the prisoner as to render the judgment

> vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

*Id.* § 2255(b). A judgment "cannot be lightly set aside by collateral attack" and "[w]hen collaterally attacked, the judgment of a court carries with it a presumption of regularity." *Johnson v. Zerbst*, 304 U.S. 458, 468 (1938), *overruled in part on other grounds by Edwards v. Arizona*, 451 U.S. 477 (1981). The burden of proof rests on the petitioner to establish a denial of constitutional rights by a preponderance of evidence. *Id.*; *United States v. Simpson*, 475 F.2d 934, 935 (D.C. Cir. 1973); *United States v. Stubblefield*, 931 F. Supp. 2d 118, 126 (D.D.C. 2013) ("The petitioner bears the burden of proof under § 2255 and must demonstrate his right to relief by a preponderance of the evidence."); *United States v. Ashton*, 961 F. Supp. 2d 7, 11 (D.D.C. 2013) (same); *United States v. Baughman*, 941 F. Supp. 2d 109, 112 (D.D.C. 2013) (same).

A prisoner is not required to be physically confined to challenge his sentence under *habeas corpus*. *Maleng v. Cook*, 490 U.S. 488, 491 (1989). Once the sentence imposed for a conviction has completely expired, however, the collateral consequences of that conviction are insufficient to render an individual "in custody" for the purposes of an attack under *habeas corpus*. *Id.*; *see also Mills v. United States*, Civil No. 98-5145, 1998 WL 796299, at *1 (D.C. Cir. Oct. 6, 1998) ("The district court correctly determined that because appellant completely served his sentence by the time he filed the petition, he is no longer 'in custody' and habeas relief is not available, regardless of the collateral consequences of the conviction.").

### 2. Analysis

Federal courts may grant a motion pursuant to § 2255 only when the defendant is "in custody under sentence of court" at the time he or she files the motion collaterally attacking the sentence or underlying conviction. 28 U.S.C. § 2255; *Maleng*, 490 U.S. at 491–92; *see also*

*Aamer v. Obama*, 742 F.3d 1023, 1030 (D.C. Cir. 2014) (explaining that "the fact" and "duration" of detention "lie at the heart of habeas corpus"); *Idema v. Rice*, Civil No. 05-2064 (EGS), 2007 WL 2020098, at *2 (D.D.C. July 12, 2007) ("The 'essence of modern habeas corpus is to safeguard the individual against unlawful *custody*.'" (emphasis in original) (quoting *Chatman-Bey v. Thornburgh*, 864 F.2d 804, 806 (D.C. Cir. 1988))); *Mills v. United States*, 1998 WL 796299, at *1 (upholding a district court's rejection of a habeas petition where "by the time [the defendant] filed the petition, he [was] no longer 'in custody' and habeas relief [was] not available, regardless of the collateral consequences of the conviction"). Collaterally adverse consequences of a conviction do not render a petitioner "in custody." *Maleng*, 490 U.S. at 492 (holding that "the possibility that the prior conviction will be used to enhance the sentences imposed for any subsequent crimes of which he is convicted" does not create custodial circumstance). Holding otherwise "would read the 'in custody' requirement out of the statute" and would allow collateral attack on convictions at any time which would disturb the finality of criminal judgments. *Id.*

As the defendant admits, he is not "in custody" for the purposes of § 2255, *see* Def.'s Mot. at 12, and the defendant concedes that "he is not currently subject to any restriction that the current weight of authority views as meeting the 'in custody' requirement of section 2255(a)." *Id.* Nonetheless, the defendant urges this Court to find that these cases were "wrongly decided and that the significant punishment that the government continues to impose upon him . . . meets the in custody standard." *Id.* (internal citation omitted). The defendant contends that this "significant punishment" includes various civil disabilities stemming from his felony convictions, including certain State and Federal restrictions on the right to bear arms, the right to serve on a jury, and the right to vote. *See id.* at 27–28.

Not a single case supports a departure from clear Supreme Court and D.C. Circuit precedent holding that after a defendant serves his sentence, he is no longer "in custody" and a court may not grant a *habeas* petition brought under § 2255. *See, e.g.*, *Maleng*, 490 U.S. at 491–92; *Aamer*, 742 F.3d at 1032 ("Our precedent establishes that one in custody may challenge the conditions of his confinement in a petition for habeas corpus, and we must 'adhere to the law of our circuit unless that law conflicts with a decision of the Supreme Court.'" (quoting *Rasul v. Myers*, 563 F.3d 527, 529 (D.C. Cir. 2009))).  Accordingly, the defendant's petition for a writ of *habeas corpus* pursuant to § 2255 must be denied.

### B.  Writ of *Coram Nobis*

#### 1.  Legal Standard

The writ of *coram nobis* is "an extraordinary tool to correct a legal or factual error," *United States v. Denedo*, 556 U.S. 904, 912–13 (2009), and "provides a way to collaterally attack a criminal conviction for a person . . . who is no longer 'in custody' and therefore cannot seek habeas relief under 28 U.S.C. § 2255 or § 2241," *United States v. Newman*, 805 F.3d 1143, 1146 (D.C. Cir. 2015) (quoting *Chaidez v. United States*, 133 S. Ct. 1103, 1106 n.1 (2013)). "[J]udgment finality," however, "is not to be lightly cast aside," *Denedo*, 556 U.S. at 916, and thus, *coram nobis* relief "is rarely available," *Zhenli Ye Gon v. Lynch*, 176 F. Supp. 3d 1, 3 (D.D.C. 2016), and may only be granted "under circumstances compelling such action to achieve justice," *United States v. Morgan,* 346 U.S. 502, 511 (1954); *see also Denedo*, 446 U.S. at 911 ("To confine the use of *coram nobis* so that finality is not at risk in a great number of cases, we were careful in *Morgan* to limit the availability of the writ to 'extraordinary' cases presenting circumstances compelling its use 'to achieve justice.'" (quoting *United States v. Morgan*, 346

U.S. 502, 511 (1954))).  The petitioner bears the burden of overcoming a presumption that the challenged judicial proceedings were correct.  *Morgan*, 346 U.S. at 512.

"In American jurisprudence the precise contours of *coram nobis* have not been 'well defined,'" *Denedo*, 556 U.S. at 910 (quoting *Bronson v. Schulten*, 104 U.S. 410, 416 (1881)), and "the D.C. Circuit's precedent in this area is thin," *United States v. Williams*, 630 F. Supp. 2d 28, 32 (D.D.C. 2009).  Nonetheless, courts have traditionally applied a four-factor test to determine whether *coram nobis* relief is warranted: "(1) a more usual remedy is not available; (2) valid reasons exist for not attacking the conviction earlier; (3) adverse consequences exist from the conviction sufficient to satisfy the case or controversy requirement of Article III; and (4) the error is of the most fundamental character."  *United States v. Faison*, 956 F. Supp. 2d 267, 269 (D.D.C. 2013) (quoting *United States v. Hansen*, 906 F. Supp. 688, 692–93 (D.D.C. 1995)); *see also United States v. Lee*, 84 F. Supp. 3d 7, 9 (D.D.C. 2015) (applying the four-factor test and citing *Hansen*, 906 F. Supp. at 692–93); *United States v. Harrison*, Criminal No. 12-088 (ESH), 2015 WL 6406212, at *2 (D.D.C. Oct. 21, 2015) (same); *Rossini v. United States*, No. 08-692 (JMF), 2014 WL 5280531, at *1 (D.D.C. Oct. 14, 2014) (same); *accord United States v. Riedl*, 496 F.3d 1003, 1006 (9th Cir. 2007) (applying the four-factor test and noting that the Ninth Circuit has "repeatedly reaffirmed this framework" (citing *Hirabayashi v. United States*, 828 F.2d 591, 604 (9th Cir. 1987))); *Bereano v. United States*, 706 F.3d 568, 576 (4th Cir. 2013) (citing *U.S. v. Akinsade*, 686 F.3d 248, 252 (4th Cir. 2012)); *Klein v. U.S.*, 880 F.2d 250, 254 (10th Cir. 1989)); *Fleming v. United States*, 146 F.3d 88, 90 (2d Cir. 1998) (applying a similar three-factor test that a *coram nobis* petitioner must establish that "1) there are circumstances compelling such action to achieve justice, 2) sound reasons exist for failure to seek appropriate earlier relief, and 3) the petitioner continues to suffer legal consequences from his conviction that

may be remedied by granting of the writ" (quoting *Foont v. United States*, 93 F.3d 76, 79 (2d Cir. 1996))); *cf. United States v. Newman*, 805 F.3d 1143, 1146 (D.C. Cir. 2015) (taking note of the factors enunciated in *Riedl* and *Faison* but addressing only whether there was "fundamental error" in an ineffective assistance of counsel case where the defendant's counsel failed to advise him of the immigration consequences of pleading guilty).

## 2. Analysis

In this case, the parties do not dispute the applicability of the four-factor test that has traditionally been applied in *coram nobis* cases. The government also does not quarrel with the defendant's claim that the first and second factors have been met.[3] Instead, the government argues that the defendant cannot satisfy the third or the fourth factor. Gov't Opp'n Def.'s Mot. ("Gov't Opp'n"), at 16–19, ECF No. 164.

With respect to the third factor—whether "adverse consequences exist from the conviction sufficient to satisfy the case or controversy requirement of Article III," *Faison*, 956 F. Supp. 2d at 269 (quoting *Hansen*, 906 F. Supp. at 692–93)—the defendant contends adverse consequences exist because he is presently suffering from several civil disabilities due to his convictions. For example, the defendant notes that Virginia, the current state in which the defendant resides, like some other states, restricts his right to gun ownership because he is a convicted felon. *See* Def.'s Mot. at 27. Moreover, the defendant points out that three states— Florida, Kentucky, and Iowa—"permanently disenfranchise anyone with a felony conviction," and six states—Alabama, Mississippi, Arizona, Nevada, and Wyoming—"have permanent disenfranchisement for at least some people with criminal convictions." *Id.* at 28. The defendant

---

[3] The defendant claims these first two factors have been met because (1) "the more usual remedies of either a direct appeal or a motion for habeas corpus relief pursuant to 28 U.S.C. § 2255, respectively, are not available . . . ," Def.'s Mot. at 27 (quoting *Rossini*, 2014 WL 5280531, at *2), and (2) *McDonnell* provided an intervening change in the law on which he could not have previously relied, *id.*

claims that a "felony conviction has other consequences as well," including restrictions on the right to serve on a jury, and on "what other countries [the defendant] can visit because some countries restrict the travel of convicted felons." *Id.*

The government disputes whether these civil disabilities are sufficient "adverse consequences" to warrant *coram nobis* relief. Averring that the "defendant alleges nothing but speculative future consequences of his convictions," the government insists that the defendant has not alleged "cognizable adverse consequences." Gov't Opp'n at 17, 18. Indeed, some circuits have made clear that "purely speculative" injuries are insufficient to invoke the "extraordinary remedy" of *coram nobis*, *Fleming*, 146 F.3d at 91 (quoting *Morgan*, 346 U.S. at 511), and that a petitioner "must at least point to 'a concrete threat that an erroneous conviction's lingering disabilities will cause serious harm,'" *id.* (quoting *United States v. Craig*, 907 F.2d 653, 658 (7th Cir. 1990)); *see also Hager v. United States*, 993 F.2d 4, 5 (1st Cir. 1993) (petitioner must demonstrate "*significant* collateral consequences from the judgment") (emphasis added)). Other circuits, however, have held that "[a]ny judgment of misconduct has consequences for which one may be legally or professionally accountable." *Hirabayashi*, 828 F.2d at 606–07; *see Fleming*, 146 F.3d at 91 n.3 (recognizing the split among the circuits and noting that the Ninth and Fourth Circuits "apparently assume that any conviction necessarily leads to continuing legal consequences for purposes of coram nobis relief"). The government "acknowledges that the D.C. Circuit has yet to decide to what extent a concrete ongoing disability must be shown for a petitioner to be eligible for a writ of error coram nobis, and that the other Courts of Appeals are not unanimous." Gov't Opp'n at 17 n.4. Nonetheless, the government urges that because the writ is an "extraordinary remedy and the finality of criminal judgments should be protected," this Court should adopt the approach of circuits requiring a "concrete legal disability." *Id.*

This issue, however, need not be reached. Assuming, without deciding, that the loss of the right to bear arms, the right to vote, the right to serve on a jury, and certain rights to travel, qualify as "adverse consequences" for the purposes of a petition for *coram nobis*, the defendant still cannot "satisfy the case or controversy requirement of Article III" because the defendant cannot show that a favorable decision would redress his alleged injuries. To meet the requirements of Article III, a petitioner must show (1) an "actual or threatened injury," (2) that the injury was caused or resulted from the conduct complained of, and (3) "that the injury is likely to be redressed by a favorable action." *Rossini*, 2014 WL 5280531, at *4; *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (explaining that "the irreducible constitutional minimum of standing" includes "injury in fact," "causation", and "redressability"). Thus, a petitioner must establish that granting a writ of error *coram nobis* would "eliminate the claimed collateral consequence and bring about the relief sought." *United States v. George*, 676 F.3d 249, 256 n.3 (1st Cir. 2012); *see also Fleming*, 146 F.3d at 90 (a *coram nobis* petitioner must show that she "continues to suffer legal consequences from [her] conviction that may be remedied by granting of the writ" (quoting *Foont*, 93 F.3d at 79)).

"In this case, even if the petitioner's writ of *coram nobis* was granted" and his convictions on Counts One and Two were vacated, "the injur[ies] he claims he suffer[s] . . . would not necessarily be redressed." *Rossini*, 2014 WL 5280531, at *4. In his petition for *coram nobis,* the defendant effectively only challenges his convictions for Counts One and Two, alleging that these convictions are "premised on lawful conduct" after *McDonnell*. *See* Def.'s Mot. at 28–29. Even if defendant's convictions for Counts One and Two were vacated, however, his felony conviction on Count Three for making a false statement under § 1001 would remain intact, along with all its encumbrances under both State and Federal law,

including the prohibition against owning a firearm or serving on a jury. *See, e.g.*, 18 U.S.C. § 922(g)(1) (prohibiting any felon from possession of any firearm); V.A. Code Ann. § 18.2-308.2 (2016) (prohibiting felons from possessing firearms under Virginia state law); 28 U.S.C. § 1865 (prohibiting felons from serving on federal grand and petit juries).[4]  In short, the defendant has not shown that his convictions on Counts One and Two cause any civil disabilities that Count Three does not.

The defendant makes no argument that his conviction on Count Three should be vacated or that this conviction on Count Three is in any way contingent on his convictions on Counts One and Two.  Nor could he.  The D.C. Circuit concluded that there was sufficient evidence for the jury to conclude that the World Series trip and related expenses were for the defendant's "'personal benefit,' and not 'in connection with official duties,'" and thus should have been reported on Schedule VI of the defendant's financial disclosure form. *Verrusio*, 762 F.3d at 20. Indeed, the defendant himself admitted to an FBI agent that he "knew he should have" disclosed the trip, and that it "wasn't an official trip."  Trial Tr. (Jan. 31, 2011 Morning) 102:1–8, ECF No. 171.  Further, the D.C. Circuit also held that the defendant's failure to disclose the trip and related expenses was "material" because it would have had "a natural tendency to influence, or [be] capable of influencing an agency function or decision." *Verrusio*, 762 F.3d at 20 (alteration in original) (quoting *United States v. Moore*, 612 F.3d 698, 701–02 (D.C. Cir. 2010)).  In this case, the D.C. Circuit concluded that by omitting items required to be on the financial disclosure form and "falsely certifying that it was nonetheless 'true, complete and correct,' . . . , Verrusio

---

[4]      As a conviction for making a false statement under 18 U.S.C. § 1001 is punishable by imprisonment of more than a year, it is a "felony" under federal law. *See Moncrieffe v. Holder*, 133 S. Ct. 1678, 1697 (2013) ("The federal definition of a felony is a crime punishable by imprisonment for more than one year.") (citing 18 U.S.C. § 3559(a)(1)–(5)).

interfered with the [House] Ethics Committee's ability to perform its function of monitoring compliance with relevant rules." *Id.* at 21 (internal citation omitted). Neither of these conclusions—that he was required to report the trip and that his failure to report the trip was "material"—have anything to do with the defendant's convictions on Counts One and Two. Thus, "[t]he record here offers no compelling reason to believe that vacating the petitioner's convictions" on Counts One and Two "would automatically restore his" civil rights of which he is presently deprived. *George*, 676 F.3d at 256 n.3.[5]

It is axiomatic that of "the irreducible constitutional minimum[s] of standing[,] . . . it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 560–61 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 43 (1976)). Although the government does not contend the defendant lacks Article III standing, "'[f]ederal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute,'" *Gunn v. Minton*, 133 S.Ct. 1059, 1064 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)), are "forbidden . . . from acting beyond our authority," *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008), and thus, a court has an "affirmative obligation," to consider whether a party has standing and, accordingly, whether the Court has jurisdiction to hear the claim, *James*

---

[5] The defendant also lodges several accusations of impropriety against the government, including the following: (1) an Assistant Attorney General declined a meeting with the defendant whereas another individual with alleged connections to Jack Abramoff, who "was charged with far more serious conduct," received a "deal," Def.'s Mot. at 22; (2) the government responded to the defendant's motion for a bill of particulars by issuing a superseding indictment with more information about Counts One and Two, *id.* at 22–23; (3) the government raised a potential conflict-of-interest issue with respect to two attorneys who entered appearances on behalf of the defendant, but delayed in filing a request for a hearing until a month before trial, *id.* at 23–24; and (4) the defendant obtained a continuance to review "thousands" of e-mails which had not been previously disclosed by the government, *id.* at 24–25. The government argues that "[n]othing here is remotely improper," Gov't Opp'n at 15, and, indeed, the defendant does not provide any arguments as to why this alleged conduct impacted his right to a fair trial. The defendant also suggests that the "resignation" of the Judge who oversaw his trial "raise[s] at least the specter that Mr. Verrusio's right to a fair and impartial tribunal was violated," but makes clear he is making this assertion merely for "preservation purposes" and that the claim "be held in abeyance pending further factual developments." Def.'s Mot. at 26. Thus, this issue need not be reached.

*Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996). Here, because the civil disabilities of which the defendant complains would not be eliminated by a favorable decision, this Court is powerless to redress the defendant's alleged injury, lacks subject-matter jurisdiction over the defendant's claims, and, thus, must dismiss the action. Fed. R. Civ. P. 12(h)(3); *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506–07 (2006). The defendant's claim is simply "beyond the borders of the Article III 'case or controversy' given the uncertainty that the judicial declaration will redress the injury." *United States v. Bush*, 888 F.2d 1145, 1150 (7th Cir. 1989).

## III.     CONCLUSION

For the foregoing reasons, the defendant's petitions for *habeas corpus* and *coram nobis* are DENIED. As the defendant is not currently "in custody," the defendant is ineligible for a writ of *habeas corpus* pursuant to § 2255. Further, because the defendant cannot show that a favorable decision would eliminate the civil disabilities stemming from his felony convictions, the defendant lacks standing to pursue his petition for *coram nobis* and this Court lacks subject-matter jurisdiction.

An appropriate order accompanies this Memorandum Opinion.


Date:  April 21, 2017

                                                    _____
                                                    BERYL A. HOWELL
                                                    Chief Judge